UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

TAMIKO JONES, et al.                                                                    PLAINTIFFS

V.                                                                   CIVIL ACTION NO. 4:03CV229-M-B

NL INDUSTRIES, et al.                                                                   DEFENDANTS

## ORDER

This cause comes before the court upon the motion [193-1] of defendant NL Industries for summary judgment, pursuant to Fed. R. Civ. P. 56. Plaintiffs Tamiko Jones et al have responded in opposition to the motion, and the court, having considered the memoranda and submissions of the parties, concludes that the motion should be granted in part and denied in part.

This is a lead paint case in which twenty plaintiffs, fourteen of them minors, seek recovery for mental impairment and other adverse consequences which they allegedly suffered as a result of exposure to lead contained in Dutch Boy paint manufactured by defendant. Each of the plaintiffs resided at an 86-year old apartment complex on 600 Dewey Street in Greenwood, Mississippi, which, plaintiffs allege, was painted with Dutch Boy lead paint during a period spanning decades. Routine health tests performed in 1997 and 1998 as part of Medicaid screenings revealed elevated blood lead levels ("EBBLs") in the minor plaintiffs in this case, and plaintiffs allege that these EBBLs resulted from exposure to defendant's lead paint. Plaintiffs filed suit against NL Industries and Jerry Purnell[1] in the Circuit Court of Leflore County, and, on

---

[1]Purnell is alleged to be the owner of the apartments in question.

1

April 29, 2003, the case was removed to this count on the basis of diversity jurisdiction.

While defendant's primary summary judgment arguments relate to the issue of causation, it does dispute that its lead paint was defective at the time of sale. Defendant argues that it was only subsequent deterioration and failure to maintain which rendered its lead paint dangerous, but the court concludes that this is a fact issue for the jury. Likewise without merit is defendant's argument that no fact issues exist regarding the existence of a feasible alternative design, within the meaning of § 11-1-63(f). Defendant argues that plaintiffs' sole evidence on this issue is provided by the expert reports of Drs. Markowitz and Rosner, and defendant submits that this court should exclude these experts due to plaintiffs' alleged failure to make them available for deposition.[2] A trial is a search for truth, and the court declines to exclude these experts on this basis, particularly considering that plaintiffs' main counsel has experienced serious disruptions as a result of Hurricane Katrina. The court does order that plaintiffs make Drs. Markowitz and Rosner available for deposition immediately, assuming that they have not done so already.

As in most lead paint cases, the element of causation is crucial in this case. A review of persuasive authority reveals that most lead paint cases have failed, often at the summary judgment stage, based upon plaintiffs' inability to present proof that the lead paint which was present at a particular location was manufactured by a specific defendant. This is hardly surprising, considering that lead paint has not been used in the last several decades, and proof is often lacking regarding what specific brand of lead paint is present at a particular location. In *Spring Branch Independent School Dist. v. NL Industries, Inc.*, 2004 WL 1404036 (Tex.

---

[2]Plaintiffs assert that they have, in fact, made the experts available for deposition but that the parties were unable to find a mutually convenient time to depose them, due in part to difficulties arising from Hurricane Katrina.

App.-Hous. 2004), a Texas state appellate court affirmed a trial court's grant of summary judgment to NL Industries, finding that "there was ... no direct evidence that NL's lead paint or pigments were applied to the areas that testified positive in the report." The court noted that a former custodian at the plaintiff school district had testified that "although he remembered the District applying Dutch Boy House Paint to three surfaces, he did not recall whether the paint contained lead or when the paint was purchased" and that "(f)urthermore, none of the three surfaces ... identified tested positive for lead paint." *Id.* at page 3. In affirming the trial court's dismissal, the appellate court observed that the plaintiff "disregard[ed] the bedrock principle of Texas law that a plaintiff must identify the manufacturer of the product that allegedly injured it." *Id.* at 4.

While the custodian's testimony in *Spring Branch* was thus held to be lacking, plaintiffs in several other lead paint cases have lacked any evidence whatsoever regarding which defendant manufactured the lead paint which allegedly injured them. Such plaintiffs have often relied upon market share theories of liability which courts have generally (but not always) found insufficient to establish causation. *See, e.g. Lewis v. Lead Industries Assn., Inc.,* 342 Ill. App. 3d 95, 104 (Ill. 2003) (holding that "[b]y failing to identify the defendant that supplied the lead pigment used in the paint to which their children were exposed, the plaintiffs failed to satisfy the causation element of a claim ... for lead poisoning); *Skipworth v. Lead Industries Ass'n, Inc.*, 547 Pa. 224, 690 A.2d 169, 173 (1997) ("As we find that application of market share liability to lead paint cases would grotesquely distort liability, we decline to apply it in this case."). *But see Thomas ex rel. Gramling v. Mallett*, 701 N.W.2d 523, 533 (Wis. 2005) (holding that, in spite of the plaintiff's inability to identify the "precise producer of the white lead carbonate pigment he

ingested at his prior residences" he could still maintain an action against lead pigment manufacturers under a "risk-contribution theory.")

In contrast to the plaintiffs in the aforementioned cases, plaintiffs in this case are, in fact, able to present evidence which creates fact issues as to whether at least some of their damages were caused by the Dutch Boy lead paint manufactured by defendant. In particular, plaintiffs rely upon the deposition testimony of William Russell, an 86-year old former painter who testified that during the years 1936-39 and 1950-52, he painted 600 Dewey properties using Dutch Boy paint manufactured by NL Industries and that this paint contained lead. Plaintiffs also present deposition testimony from former painter Nathaniel Metcalf who testified that, in the 1950s and 60s, he did painting work on the 600 Dewey Property as an employee for JD Lanham Real Estate, which owned and operated the property from 1936 to 1984. While his recollection of events was not as detailed as Russell's, Metcalf indicated that the only paint used by his employer was Dutch Boy paint manufactured by defendant, and he testified that the packaging on much of this paint indicated the presence of lead.[3] It should also be noted that defendant acknowledges that a chemical analysis of the paint at 600 Dewey performed by Dr. Richard Lee revealed the presence of lead, although defendant submits that "less than 3% of the sampled paint layers containing lead resembled the description of NL's product offered by Mr. Russell."

---

[3] Metcalf does not appear to have testified that he used lead paint specifically on the 600 Dewey apartments. However, considering the facts in the light most favorable to the non-moving party, it is apparent that Metcalf's testimony that JD Lanham used Dutch Boy lead paint buttresses Russell's more specific testimony on this issue.

In addition, former JD Lanham book-keeper Lorene Floyd testified that her ex-employer used Dutch Boy paint during most of her 45 years as an employee, including during a 1946 renovation of the 600 Dewey Street property. She did not recall whether the paint was lead paint, but her testimony nevertheless appears to supply some level of corroboration to certain aspects of Russell and Metcalf's testimony.

In the court's view, defendant's summary judgment evidence suggests that (depending upon how the proof develops at trial) plaintiffs *may* find it difficult to meet their burden of proof regarding the full extent of damages which they seek in this case. At the summary judgment stage, however, plaintiffs' task is far simpler. To survive summary judgment, plaintiffs need only present evidence establishing fact issues as to whether the unreasonably dangerous condition of defendant's Dutch Boy lead paint was a proximate cause (even a relatively minor one) of the damages (even relatively minor damages) which they suffered in this case. Defendant raises arguments and cites evidence regarding possible other sources of lead (including from glass and gasoline in the soil) at 600 Dewey, and the jury might well find this evidence to be persuasive.[4] It must be emphasized, however, that the court is required at the summary judgment stage to interpret the facts in the light most favorable to the non-moving party, and this court is simply unable to make the sort of factual inferences urged by defendant in support of its motion.

Defendant also seeks summary judgment as to the issue of damages, but the court concludes that genuine fact issues exist on this issue as well. As noted previously, routine health tests performed in 1997 and 1998 as part of Medicaid screenings revealed elevated blood lead

---

[4]Defendant notes that testing revealed that certain areas of dirt outside 600 Dewey apartments contained in excess of 5,000 ppm of lead. Defendant notes that, at these levels, the EPA recommends that the dirt be removed, placed in a sanitary landfill and replaced. Defendant's expert Dr. Lee testified that 85% of the lead in the soil came from non-paint sources, mainly gasoline and glass. Thus, presumably 15% of the lead in the soil came from paint sources, even assuming that Dr. Lee's testimony is deemed to be accurate. The court accordingly does not view Dr. Lee's testimony as supporting summary judgment, given that the testimony appears to acknowledge that lead paint at least contributed to the high lead levels in the dirt outside 600 Dewey. Moreover, plaintiffs dispute much of Dr. Lee's testimony, and its reliability is clearly a matter for the jury.

levels ("EBBLs") in the minor plaintiffs in this case, each of whom resided at 600 Dewey. Defendant concedes that plaintiffs have each shown blood lead levels in excess of 10 mcg/dl, and defendant further concedes that current medical research supports a conclusion that blood lead levels in excess of this amount may cause a loss of "one to three IQ points."[5] In addition, it is undisputed that each of the minor plaintiffs in this case have demonstrated mental abilities well below normal for children their age. In the court's view, the aforementioned facts serve to create fact issues as to whether plaintiffs suffered at least some injury in this case as a result of the allegedly defective condition of defendant's product.

Mississippi law provides that, where it is certain that the plaintiff has sustained some damage but the exact amount is uncertain, plaintiff may recover if the proof is sufficient to afford a reasonable basis to estimate the amount of the loss. *Purina Mill, Inc. v. Moak*, 575 So. 2d 993, 998 (Miss. 1990). Plaintiffs have clearly established fact issues as to whether they suffered *some* loss of mental capacity and whether such loss was at least partly a result of exposure to the lead paint manufactured by defendant. In the court's view, even a loss of one or two IQ points would constitute a compensable injury under Mississippi law, and defendant would find it difficult to argue otherwise. Clearly, plaintiffs hope to recover far more damages than that which might be

---

[5]In support of this argument, plaintiffs cite a recent Center for Disease Control study which showed that neurocognitive deficits may occur in children even at levels below 10 mcg/dl. Defendant concedes that recent scientific literature does show that there are "associations between EBBLs and *some* of the claimed defects" alleged by plaintiffs, but defendant argues that these associations are insufficient to establish causation. Specifically, defendant argues as follows:
> While it is true that many in the health community believe that blood lead levels above 10 mg/dl can effect neurodevelopmental status, the only causal connection consistently found has been between EBLLs and a *small* decline in IQ.

Thus, defendant appears to concede that EBLLs such as those experienced by plaintiffs have been "consistently found" to have a causal connection with a "small decline in IQ."

recovered for a loss of one or two IQ points, and it is apparent that many of the plaintiffs in this case demonstrate profound intellectual disability. Regardless, the *extent* of damages which is supported by the evidence is an issue properly considered at trial, rather than on motion for summary judgment. It may eventually prove necessary for the court to consider many of the arguments raised by defendant in the context of a motion for remittitur, but at this juncture, the court need only conclude, as it does, that plaintiffs have presented sufficient proof on the design defect, causation, and damages issues to survive a motion for summary judgment as to plaintiffs' product liability claims.

The court does conclude that defendant's motion for summary judgment should be granted as to plaintiffs' fraudulent misrepresentation claims. There is no evidence in the record as to any fraudulent representations made by NL Industries in order to induce plaintiffs' reliance, and the court finds plaintiffs' arguments that such fraud should be imputed to defendant based upon statements allegedly made by JD Lanham employees to be unpersuasive. The court likewise concludes that plaintiff's failure to warn claims should be dismissed. It is clear that plaintiffs seek the imposition of a post-sale duty to warn, and the Fifth Circuit has concluded that § 11-1-63 "precludes imposition on a manufacturer or seller of a post-sale duty to warn." *Austin v. Will-Burt Co.*, 361 F.3d 862, 870 (5th Cir. 2004). *See also Noah v. General Motors Corp.*, 882 So.2d 235, 239 (Miss. App. 2004) ("creating a post-sale duty to warn appears to conflict with § 11-1-63.") Even if this legal bar were not present, the court would nevertheless find plaintiffs' argument that defendant had a duty to place a warning sign on the painted surface of the 600 Dewey apartment (and presumably on the painted surface of every other building nationwide in which its lead paint was used) to be unreasonable. Moreover, the element of causation would

7

likely be lacking as well.

Defendant also seeks summary judgment as to plaintiffs' attempts to recover damages for future medical monitoring. The court would note that the Fifth Circuit recently certified the issue of the availability of a medical monitoring "cause of action" under Mississippi law to the Mississippi Supreme Court. *See Paz v. Brush Engineered Materials, Inc.*, 2006 WL 895092 (5th Cir. April 7, 2006). Defendant seeks for the court to stay this action until the Mississippi Supreme Court clarifies this issue, but the court concludes that such a stay is unnecessary. It appears to this court that *Paz* is distinguishable, inasmuch as that case dealt with the issue of whether such medical monitoring damages were available absent "present physical injuries." *Paz*, slip op. at 5. Plaintiffs allege present physical injuries in this case, and it is apparent that they seek medical monitoring as an elements of damages rather than as a separate cause of action. Out of an abundance of caution, the court will nevertheless require that the jury render any award of medical monitoring damages separate from the remaining damages. Thus, the Fifth Circuit may simply strike this element of damages on appeal if it concludes that the Supreme Court's eventual holding in *Paz* so dictates.

The court will reserve judgment until trial on the remaining issues, including the issue of punitive damages.[6] While it seems doubtful that plaintiffs will be able to demonstrate the level of egregious misconduct so as to permit punitive damages under § 11-1-65, the court sees little benefit to pre-judging this issue, given that this statute mandates bifurcated proceedings regardless.

---

[6]It should be noted that statute of limitations issues are not raised in this case, presumably because of the operation of Mississippi's minor savings statute.

In light of the foregoing, it is ordered that defendant's motion [193-1] for summary judgment is granted in part and denied in part. Defendant's motion to stay [241-1] is denied. Defendant Jerry Purnell's motion [242-1] for leave to file joinder in NL Industries summary judgment motion out of time is denied.[7]

SO ORDERED, this the 24th day of May, 2006.

     /s/ Michael P. Mills
     **UNITED STATES DISTRICT JUDGE**

---

[7]In the court's view, Purnell provides insufficient basis for being allowed to join NL's motion for summary judgment out of time. Regardless, this court has denied NL's motion as it relates to the arguments which Purnell seeks to join, and this issue is therefore moot.