UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

TAMIKO JONES, et al.                                                                  PLAINTIFFS

V.                                                          CIVIL ACTION NO. 4:03CV229-M-B

NL INDUSTRIES, et al.                                                                 DEFENDANTS

## ORDER

The court presently has before it competing *Daubert* motions filed by the parties, seeking to exclude various experts retained by the opposing side.[1]

Before analyzing the reliability of the expert testimony in this case, the court would first make some general observations regarding the nature of this case and the role of expert testimony

---

[1]*Daubert* "provides the analytical framework for determining whether expert testimony is admissible under Rule 702 of the Federal Rules of Evidence." *Pipitone v. Biomatrix, Inc*., 288 F.3d 239, 243 (5th Cir.2002) Under *Daubert*, trial courts act as gate-keepers overseeing the admission of scientific and non-scientific expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Trial courts must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93, 113 S.Ct. 2786. Stated differently, the trial judge must determine whether the expert testimony is both reliable and relevant. Id. at 589, 113 S.Ct. 2786.
    Many factors bear on the inquiry into the reliability of scientific and other expert testimony, including, but not limited to, whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community. *Id*. at 593-94, 113 S.Ct. 2786. The district court's responsibility "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152, 119 S.Ct. 1167.
    The four factors identified in *Daubert* form the starting point of the inquiry into the admissibility of expert testimony. *Pipitone*, 288 F.3d at 245 (quotation omitted). However, "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho*, 526 U.S. at 150, 119 S.Ct. 1167. Whether an expert's testimony is reliable is a fact-specific inquiry. *Skidmore v. Precision Printing and Pkg., Inc.*,188 F.3d 606, 618 (5th Cir.1999).

within it. The *Daubert* analysis is not a rigid one to be applied in a similar manner in all cases, but, rather, must be tailored to fit the needs and particularities of each case. This is a lead paint case in which the court has before it fourteen minor plaintiffs who, the parties agree, have shown elevated blood lead levels in excess of 10 mcg/dl and who show mental abilities considerably below average for children their age. The parties have retained numerous experts for the purpose of establishing whether plaintiffs' mental impairments result from lead exposure or, rather, from genetic or other factors. Based upon the parties' representations in their briefs, it seems undisputed that blood levels above 10 mcg/dl tend to cause, at the very least, minor intellectual impairments in the order of (to use defendant's words) "one to three IQ points."

As this court noted in its order denying summary judgment, in cases where plaintiffs can demonstrate that they suffered *some* damages as a result of a particular defendant's misconduct, Mississippi law becomes somewhat more forgiving with regard to the level of proof needed to establish the exact amount of such damages. In *Purina Mill, Inc. v. Moak*, 575 So. 2d 993, 998 (Miss. 1990), the Mississippi Supreme Court noted that where it is certain that the plaintiff has sustained some damage but the exact amount is uncertain, plaintiff may recover if the proof is sufficient to afford a "reasonable basis to estimate" the amount of the loss. The Supreme Court also emphasized, however, that the plaintiff is "required to provide proof of damages with as much certainty and accuracy as ... reasonably possible." *Id.*

*Purina Mills* appears particularly relevant to this case, inasmuch as that case involved allegations that Purina cattle feed sold to plaintiffs contained metals which, plaintiffs contended, resulted in illness, death and reduced milk production from their cattle. Clearly, this fact pattern presented difficult causation and damages issues similar to those in the instant case. Assuming

2

that the plaintiffs in this case are able to prove at trial that they suffered damages from exposure to lead paint manufactured by defendant, this court will only require plaintiffs to provide a "reasonable basis to estimate" the specific amount of those damages, but the court will require them to make this showing "with as much certainty and accuracy as reasonably possible" given the current state of medical technology as it relates to lead toxicology.

Assuming that the jury concludes that the lead in defendant's paint resulted in plaintiffs' EBLLs (and the fact issues on this point are clearly jury issues), then a jury could arguably conclude under Mississippi law that plaintiffs are entitled to some level of damages for minor mental impairment. It seems clear, however, that the plaintiffs in this case have IQs which are well in excess of one or two points below average, and plaintiffs clearly hope to recover an amount of damages which would compensate them for very significant intellectual impairments. On this issue, it seems quite doubtful that this trial can or will produce evidence conclusively establishing the precise extent to which plaintiffs' mental impairments are the result of lead exposure. This follows logically from the fact that children, like all humans, naturally demonstrate a wide range of intellectual abilities, quite apart from the issue of exposure to lead. This fact makes the element of causation in lead toxicology cases a more difficult one than in cases involving some other form of medical impairment as to which there exists a clear baseline standard of medical normality.

From reviewing the depositions and reports of the experts in this case, it appears impossible for any expert for either plaintiffs or defendant to conclusively establish exactly what a particular plaintiff's intellectual capacity would have been if he or she had not been exposed to excessive levels of lead. The element of causation is even more complex in this case, given that

testing has revealed the existence of high levels of lead in other locations in and around the 600 Dewey apartments other than on painted walls.

The difficulty of the causation issue in this case does not mean that this court should simply "throw up its hands" and dismiss this case based upon the impossibility of plaintiffs ever proving the cause of their intellectual impairments. Given that there clearly appears to be a medical basis for concluding that plaintiffs suffered at least *some* minor degree of medical impairment due to elevated blood lead levels, and given that the extent, if any, to which defendant's product contributed to those elevations is a jury issue,[2] Mississippi law is, to reiterate, somewhat forgiving with regard to the degree of proof needed to establish the exact amount of damages. At the same time, a rather forgiving standard of damages is no license for this court to tolerate either expert testimony or a verdict which is based upon guesswork or speculation. This court will therefore be faced with the task in this case of not requiring a level of certainty in expert testimony and proof which exceeds that required by Mississippi law, yet which still provides the most reliable testimony possible under the circumstances.

## **ANALYSIS**

Turning to the specific *Daubert* motions filed by the parties, the court would emphasize that striking a particular expert outright is not necessarily in order if the opposing side is able to adequately demonstrate to the jury the weaknesses of that expert's methodologies on cross-examination. It appears that plaintiffs have made overbroad use of *Daubert* motions in this case

---

[2]The fact that this is a jury issue obviously means that a jury could reasonably conclude, depending upon the proof at trial, that defendant should face no liability whatsoever in this case. Accordingly, the court does not suggest that plaintiffs will be entitled to recover even minor damages in this case.

to take issue with rather limited aspects of the testimony of opposing experts, even though plaintiffs will be given a full opportunity to cross-examine the witnesses regarding these issues at trial.³ Moreover, nothing in this court's rulings today will prevent the parties from raising specific objections at trial (if necessary in a sidebar) to strike any specific testimony sought to be elicited from any expert. At the same time, the court does not conclude that any of the expert witnesses retained by either party are so unreliable that they should be barred from testifying outright under *Daubert*. While all of the paid experts in this case are arguably biased to some extent ,⁴ it appears that plaintiffs and defendant each took considerable care (not to mention expense) in selecting experts who are qualified in their respective areas of expertise. Subject to the foregoing caveats, the court will now discuss the specific objections raised to the experts in this case.

### Dr. Quinten and Dr. Parker

Plaintiffs first seek to strike two experts who provide arguably duplicative expert testimony that plaintiffs' neurological deficits were most likely caused by genetic, familial and environmental factors, rather than lead exposure. For example, Dr. Barbara Quinten, director of the medical genetics department at Howard University, testified to her view that various plaintiffs had familial histories of low intelligence and/or mental retardation which explained

---

³This court would encourage plaintiffs to exercise more discretion in filing future motions with this court.

⁴ From reviewing the numerous *Daubert* motions and the deposition testimony contained therein, it is arguable, and perhaps unsurprising, that *all* of the experts in this case appear from their testimony to carry with them certain biases in favor of the party which is paying them several hundred dollars per hour for their testimony. If this court wished to obtain a completely objective expert witness, it would likely have to pay that witness itself.

their symptoms. Dr. Colleen Parker, professor of pediatrics and neurology at the University of Mississippi Medical Center, similarly testified that such factors as "familial history of retardation, poor environmental stimulation, and economic deprivation," rather than elevated blood lead levels, explained the plaintiffs' deficits.

Plaintiffs seek to strike both Drs. Quinten and Parker, based upon their lack of expertise in the area of lead toxicology, their allegedly non-mainstream views regarding EBLLs, and upon the cumulative nature of their testimony. The court does agree that the testimony of Drs. Quinten and Parker is to some extent redundant, and defendant should be prepared to explain at trial why the testimony of both witnesses is necessary. The court does not intend to permit a particular expert witness to redundantly cover the same ground covered by a previous expert witness. At the same time, the court does not have any particular concerns regarding the reliability of the methodologies used by these experts in analyzing the family histories of the plaintiffs in this case, nor does the court question their professional qualifications. The court is less impressed with the qualifications of these witnesses as it relates to lead toxicology, but the court concludes that plaintiffs may sufficiently demonstrate any weaknesses in the witnesses' expertise in this regard during cross-examination.

### Dr. Elkin and Dr. Manning

Plaintiffs next seek to exclude defense experts Dr. T.D. Elkin and Dr. Edward L. Manning, each of whom performed neuopsychological testing similar to that performed by plaintiffs' expert in this case. While the court does not take issue with Dr. Manning's testimony, it does agree with plaintiffs that Dr. Elkin should be precluded from testifying in this case regarding the level of lead exposure necessary for a child to suffer neurocognitive deficits. Dr.

6

Elkin testified in his deposition to his view that blood lead levels of 70 mcg/dl would be necessary for a child to suffer such neurocognitive deficits. Plaintiffs argue, and correctly so in this court's view, that this expert opinion is well outside the mainstream of current scientific thought regarding EBLLs.[5] Moreover, as with Drs. Quinten and Parker, the court finds the testimony of Drs. Manning and Elkin to be largely cumulative. The court declines to strike Dr. Elkin's testimony outright (subject to the aforementioned limitation) at this juncture, but the court does instruct defendant to be prepared to explain at trial why the testimony of this witness is necessary in light of Dr. Manning's testimony.

**Dr. R.J. Lee**

Plaintiffs next seek to exclude the testimony of Dr. R.J. Lee due to alleged weaknesses in the methodologies which this expert used to analyze the lead present in the soil and paint at the 600 Dewey complex. The court concludes that Dr. Lee's testimony constitutes an important part of this trial, and plaintiffs may raise their objections to Dr. Lee's methodologies during cross-examination and, if necessary, in their rebuttal case. This motion to strike will therefore be denied.

---

[5]In support of this argument, plaintiffs cite a recent Center for Disease Control study which showed that neurocognitive deficits may occur in children even at levels below 10 mcg/dl. Defendant concedes that recent scientific literature does show that there are "associations between EBBLs and *some* of the claimed defects" alleged by plaintiffs, but defendant argues that these associations are insufficient to establish causation. Specifically, defendant argues as follows:
> While it is true that many in the health community believe that blood lead levels above 10 mg/dl can effect neurodevelopmental status, the only causal connection consistently found has been between EBLLs and a *small* decline in IQ.

Thus, defendant appears to concede that EBLLs such as those experienced by plaintiffs have been "consistently found" to have a causal connection with a "small decline in IQ."

**Dr. Wecker**

Plaintiffs' motion to strike the testimony of mathematician and statistician Dr. William E. Wecker will be denied. Dr. Wecker appears to be a rebuttal witness who may testify regarding weaknesses in the specific methodologies (including epidemiological studies) used by plaintiffs' expert witnesses with regard to the issue of causation. It appears to this court that Dr. Wecker might offer only limited helpful testimony in this case, and the court intends to keep this witness on a relatively short leash. The court can not conclude, however, that this witness should be precluded from testifying.

**Dr. Josephine Posey**

Plaintiffs seek to strike Dr. Posey, who has been retained by defendant to opine that the Greenwood Leflore County School System has sufficient facilities to treat the lead poisoned children in this case. While the court does not intend to permit the parties to spend a great deal of time at trial on this subject matter, the court concludes that Dr. Posey can testify, in a concise manner, regarding the facilities in question. The court will preclude Dr Posey from testifying regarding scientific matters regarding lead exposure, given that she is not an expert in this area.

**Dr. Nancy Hebben**

Plaintiffs next seek to exclude the testimony of Dr. Nancy Hebben, who has been retained to critique the methodologies used by plaintiffs' experts Dr. Lidsky and Dr. Schneider. As the court makes clear *infra*, it intends to grant defendant wide latitude to critique the methodologies used by Dr. Lidsky, and plaintiffs' motion will therefore be denied. At the same time, Dr. Hebbens' apparent view that blood lead levels of greater than 80 mcg/dl are necessary for a child to suffer brain damage would appear to contradict current medical thinking, and the court will

8

preclude Dr. Hebbens from testifying to this effect, barring some specific showing by defendant at trial that such testimony is reliable.

### Dr. Robert J. McCunney

Plaintiffs next seek to exclude Dr. McCunney, who has been retained to critique plaintiffs' expert Dr. Rosen's proposed medical monitoring program for plaintiffs. This court does not intend to give the parties any more time than is necessary to address this issue, but to the extent that this testimony is necessary and relevant, the court concludes that Dr. McCunney is qualified to critique Dr. Rosen's testimony in this regard. Plaintiffs note that Dr. McCunney has not treated children for lead poisoning, but his expert report indicates that he has evaluated numerous adults for this condition. Moreover, Dr. McCunney's report appears to set forth legitimate points of contention as it relates to Dr. Rosen's proposed monitoring program. In the court's view, the fact that Dr. McCunney has not treated children is a matter which can be addressed during cross-examination, and the motion to strike will therefore be denied.

### Drs. Markowitz and Rosner

Defendant seeks to strike the exhibits prepared by plaintiffs' experts Drs. Markowitz and Rosner due to plaintiffs' alleged failure to make them available for depositions. This motion will be denied at this juncture, but the court orders that plaintiffs immediately make these experts available to be deposed, assuming that they have not done so already. The court may well revisit its ruling in this regard if plaintiffs fail to make these witnesses available to be deposed.

### Dr. Theodore Lidsky

Defendant seeks to exclude the testimony of plaintiff's expert Dr. Lidsky 1) due to alleged weaknesses in the methodologies used by this witness in concluding that the minor

9

plaintiffs herein suffered brain damage due to lead exposure and 2) due to alleged biases on his part. The court is, in fact, given pause by the fact that, as noted by defendant, Dr. Lidsky has consistently concluded (following examinations of over 500 children) that children with elevated blood lead levels whom he examined suffered some kind of brain injury. At the same time, defendant concedes, as noted previously that:

> While it is true that many in the health community believe that blood lead levels above 10 mg/dl can effect neurodevelopmental status, the only causal connection consistently found has been between EBLLs and a *small* decline in IQ.

It is certainly arguable that, if EBLLs are (as defendant itself admits) "consistently" associated with even a small decline in IQ, then this would tend to cast Dr. Lidsky's similarly consistent findings of brain injury in children with elevated blood levels in a less damaging light than defendant suggests. Moreover, the issue of whether Dr. Lidsky is merely a "hired gun" who consistently sides with plaintiffs who retain him is a matter which can readily be understood by the jury on cross-examination, and the court will give defendant great leeway to cross-examine Dr. Lidsky on this regard.

Defendant also raises specific objections to Dr. Lidsky's methodologies, including his not having used a control group for his testing and his use of the "best performance method." While defendant's objections to Dr. Lidsky's methodologies appear (to this court's untrained mind) to have at least some superficial basis in logic, plaintiffs have attached an affidavit from Dr. Kim N. Dietrich, whose affidavit states that she is a professor at the University of Cincinnati School of Medicine and an expert in the area of the "developmental neurotoxicity of lead." In her affidavit, Dr. Dietrich specifically endorses the "best performance method" used by Dr. Lidsky in this case, and she likewise specifically rejects defendant's argument that Dr. Lidsky did not use a proper

differential diagnosis method. In the court's view, the combined views of these childhood lead poisoning experts that Dr. Lidsky's methodologies were proper supports the jury being permitted to consider Dr. Lidsky's testimony.

While defendant appears to raise some valid concerns regarding certain aspects of Dr. Lidsky's testimony, it should also be noted that the court has some skepticism regarding the ability of *defendant's* experts to confidently opine that the fourteen minor plaintiffs who have shown high lead levels and who have demonstrated significant intellectual disabilities did not suffer these disabilities as a result of lead exposure. As noted previously, this court is cognizant of the fact that lead toxicology is itself very much an inexact science, and, partly in recognition of this fact, the court has granted both plaintiffs and defendant considerable leeway in their use of expert testimony.

Dr. Lidsky is apparently renowned as one of the foremost experts in lead toxicology among children and, in the court's view, a childhood lead poisoning expert is essential for the jury's understanding of this lead poisoning case. This is especially true considering that none of the experts retained by defendant are experts in the specific field of lead toxicology in children, and, indeed, some of them appear to espouse certain outdated and/or doubtful views on the subject. In sum, the court concludes that Dr. Lidsky's testimony will assist the jury in this trial, although the court does intend to give defendant wide latitude in cross-examining this witness and will entertain specific objections to this expert's testimony at trial.

In light of the foregoing, it is ordered that plaintiff's motions to strike the testimony of Dr. Manning and Dr. Elkin [202-1] Dr. Quinten [204-1], Dr. Parker [203-1], Dr. Lee [236-1], Dr. Wecker [205-1], Dr. McCunney [200-1], and Dr. Hebben [201-1], Dr. Posey [192-1] are denied,

subject to the caveats and limitations set forth in this order.

Defendant's motion to strike Drs. Markowitz and Rosner [195-1] and Dr. Lidsky [198-1] are denied, subject to the caveats and limitations set forth in this order.

Defendant's motion for leave to file a surrebutal brief [217-1] is granted.

**SO ORDERED** this 24th day of May, 2006.

                                      **/s/ Michael P. Mills**
                                      **UNITED STATES DISTRICT JUDGE**